# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| VIRGIE ARTHUR, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-07-3742 |
| | § | |
| HOWARD K. STERN, | § | |
| CBS STUDIOS, INC, and | § | |
| KPRC HOUSTON, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

Plaintiff, Virgie Arthur, asserts state-law claims for defamation and conspiracy to defame against Howard K. Stern, CBS Studios, Inc., and KPRC Houston. The claims arise out of statements Arthur's daughter, the late Vickie Lynn Marshall – better known as Anna Nicole Smith – made about Arthur in an interview. That interview was recorded by CBS Studios, Inc. and broadcast on national television. The CBS affiliate in Houston, Texas, KPRC Houston, was among those broadcasting the interview.

Arthur filed this suit in Texas state court. The defendants timely removed on the basis that KPRC Houston, the only nondiverse defendant, was improperly joined. Arthur moved to remand, (Docket Entry No. 15), but later withdrew that motion, (Docket Entry No. 71). The pending motions are Arthur's motion for leave to amend to name additional party defendants and to add facts relating to this court's personal jurisdiction over defendant

Howard Stern, (Docket Entry Nos. 45, 48, 49), and Howard Stern's motion to dismiss for lack of personal jurisdiction, (Docket Entry No. 8, 9).[1]

Based on the pleadings, the motions, responses and replies, the parties' arguments, the materials submitted, and the applicable law, this court denies Arthur's motion for leave to amend to add additional defendants, denies her motion for leave to amend to add jurisdictional facts, and denies Stern's motion to dismiss.[2]  The reasons for these rulings are explained in detail below.

## I.    Background

Vickie Lynn Marshall married a very wealthy and much older man.  When he died, her claim to his estate generated highly publicized litigation.  Marshall received extensive media attention.  Howard Stern served as Marshall's attorney and companion.  In July 2006, Stern and Marshall moved to the Bahamas, where Marshall established residency.  Stern, a California resident, was living in the Bahamas with Marshall when she gave the television interview that included the statements at issue in this case.  (Docket Entry No. 9, Ex. A).

---

[1]Arthur responded to Stern's motion to dismiss, (Docket Entry Nos. 39, 78, 83, 88), and Stern filed a reply and a supplemental reply, (Docket Entry Nos. 22, 81).  CBS and KPRC responded to Arthur's motion for leave to amend, (Docket Entry No. 56), as did Stern, (Docket Entry No. 57), and Arthur replied, (Docket Entry Nos. 62, 64).  Arthur, CBS, and KPRC also filed supplemental briefs, (Docket Entry Nos. 74, 75, 82, 86).

[2] Arthur also filed a motion to compel the production of documents from Stern relevant to the personal jurisdiction issue.  (Docket Entry No. 51).  Rose and Kenneth Turner have filed a motion to quash subpoenas issued by Arthur seeking the production of materials relevant to the alleged conspiracy involving the individuals that Arthur seeks to add as additional defendants, (Docket Entry No. 54).  In light of this court's finding that it has personal jurisdiction over Stern and the denial of Arthur's motion for leave to amend to add defendants, these motions are denied as moot.

On September 7, 2006, Marshall gave birth to a daughter.  On September 10, 2006, Marshall's adult son, Daniel, died while visiting her in the Bahamas.  Both events were heavily publicized.  Marshall left a telephone message for Arthur about Daniel's death.  Arthur gave a copy of that recorded message to the media.  Arthur also appeared on national television to be interviewed.  She spoke about Daniel's death and the relationship between Marshall and Stern, stating that Marshall should be more cautious about the people she surrounded herself with.  (Docket Entry No. 2; Docket Entry No. 9).

On October 28, 2006, Marshall gave an interview that was broadcast to a national audience on the CBS television program *Entertainment Tonight*.  The interview took place at Marshall's home in the Bahamas.  Stern was involved in arranging the interview and sat next to Marshall as it was taped.  During the interview, Marshall discussed a variety of topics, including her baby daughter and her son's death.  Marshall also talked about the statements Arthur had made in the nationally broadcast interview she gave.  Marshall accused Arthur of having abused her during childhood and permitting Marshall's father and siblings to abuse her.  These accusations were included in the *Entertainment Tonight* broadcast.  They are the basis of Arthur's defamation claim in this lawsuit.

The *Entertainment Tonight* interview was originally broadcast in November 2006.  Additional parts of the interview were broadcast on February 14, 2007.  (Docket Entry No. 2; Docket Entry No. 9).  The evidence showed that the local CBS affiliate in Houston was contractually obligated to broadcast the interview as a result of its relationship with CBS Studios, Inc.  (Docket Entry No. 19, Ex. A).

3

In the petition she filed in Texas state court, Arthur alleged that Stern urged and encouraged Marshall to make the defamatory statements during the *Entertainment Tonight* interview.   Arthur alleged that Stern arranged the *Entertainment Tonight* interview and conspired with CBS to have Marshall make the defamatory statements about Arthur in retaliation for Arthur's statement during the televised interview she gave that Marshall should be cautious about the people who surrounded her.  (Docket Entry No. 2).

Marshall died in February 2007.  That led to even more intense media coverage. Conflicting claims to the baby daughter and the money Marshall left generated more litigation and more publicity.  Arthur and Stern were among those raising conflicting claims, including about the right to dispose of Marshall's body.  Stern played a videotape of the *Entertainment Tonight* interview during court proceedings in Florida involving his dispute with Arthur over the disposal of Marshall's body.  That videotape was televised nationally.

After Arthur sued Stern, CBS, and the Houston CBS affiliate in state court, alleging that the *Entertainment Tonight* interview contained defamatory statements, the defendants removed on the basis that the claim against the affiliate – the only nondiverse party – was without merit, as a matter of law.  Arthur moved to remand on the ground that KPRC was properly sued, (Docket Entry No. 15), but later withdrew that motion, (Docket Entry No. 71), conceding that KPRC Houston was improperly joined.  Removal was proper because there was no reasonable possibility that Arthur could prevail against KPRC, as a matter of law.[3]

---

[3] The record shows that KPRC had no input into or control over the reporting, production, content, or editing of the broadcast.  KPRC received the program via a signal from a satellite transponder, did not see or review the program before it aired, and was contractually prohibited from making any substantial changes

As a result, the claims against KPRC are dismissed.  *See Plaquemines Parish School Bd. v. Norris Ins. Consultants Inc.*, No. 07-31155, 2008 WL 2337285, at *1 (5th Cir. June 9, 2008) (stating that a court must dismiss a party that was improperly joined).

The first issue now before this court is whether to grant Arthur's motion to expand this suit to include claims against the proposed new defendants, Bonnie Stern, Howard Stern's sister, and "bloggers" who were interested in Marshall and expressed their interest on the internet.  The second issue is whether the claims against Howard Stern must be dismissed for lack of personal jurisdiction.

## II.   Arthur's Motion for Leave to Amend to Add Additional Parties

Arthur seeks leave to amend her original complaint to add Bonnie Stern, Art Harris, Nelda Turner, TMZ Productions, Inc., and Harvey Levin as defendants.  Bonnie Stern is Howard Stern's sister.  Nelda Turner is a Texas resident who operates the website "Rose Speaks."  TMZ Productions, Inc., a California corporation, operates an entertainment news website, "TMZ.com."  Harvey Levin is TMZ's Executive Producer/Managing Editor.  Art Harris operates a website called "The Bald Truth" and appears on *Entertainment Tonight* as a "special correspondent."

Arthur acknowledges that "the new defendants were not the original conspirators who put Anna Nicole Smith up to making the defamatory statements broadcast on television."

---

to the program.  (Docket Entry No. 19, Ex. A).  Among other problems with Arthur's claim against KPRC Houston, she would be unable to show that KPRC broadcast the interview with the constitutionally required degree of knowledge that it included statements that were false as alleged.  *See New York Times Co. v. Sullivan*, 376 U.S. 254 (1964); *Watkins v. Tex. Dept. of Criminal Justice*, No. 06-20843, 2008 WL 686571, at *7 (5th Cir. March 12, 2008).

Arthur alleges that these new defendants "joined the conspiracy later and took directions from Howard K. Stern, the kingpin of the conspiracy, through his sister Bonnie Stern, and his legal counsel." (Docket Entry No. 86 at 3). Arthur alleges that these individuals and entities conspired to publish defamatory statements about Arthur on the TMZ website, TMZ.com; on Art Harris's website, "The Bald Truth"; and on Nelda Turner's website, "Rose Speaks." The alleged defamatory statements included republications of Marshall's accusations of childhood abuse as well as statements that Arthur had a sexual relationship with her stepbrother that produced a child.

Arthur alleged the following facts as the basis for her claim that Howard Stern and Bonnie Stern directed a conspiracy to put defamatory statements about Arthur on various websites:

> Bonnie [Stern] and Rose [Nelda Turner] spoke on the telephone "numerous times a day, quite often." Bonnie and Rose directed other members of the group. Art Harris and Rose Turner collaborated on a defamatory story about Virgie Arthur and a cousin for the benefit of Howard Stern. The conspirators gave Art Harris "scoops" from the information they were gathering; Rose and Art were "a team." TMZ and Harvey Levin entered into an agreement to publish articles favorable to Howard Stern, in return for "scoops," and Levin for TMZ wound up publishing the defamatory story about Virgie Arthur marrying her step-brother and having a child by him, a story promoted by Rose Turner.

(Docket Entry No. 86 at 4–5) (footnotes omitted).

Arthur agrees that the proposed additional defendants are not indispensable. Arthur also agrees that adding these defendants would destroy this court's diversity jurisdiction.

6

### A.    The Legal Standard for a Motion for Leave to Amend

Rule 15(a) of the Federal Rules of Civil Procedure provides that a party may amend their pleading once without seeking leave of court or the consent of the adverse party at any time before a responsive pleading is served.  After a responsive pleading is served, a party may amend only "with the opposing party's written consent or the court's leave."  FED. R. CIV. P. 15(a).  Although a court "should freely give leave when justice so requires" under Rule 15(a), leave to amend "is not automatic." *Matagorda Ventures, Inc. v. Travelers Lloyds Ins. Co.*, 203 F. Supp. 2d 704, 718 (S.D. Tex. 2000) (citing *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981)).

"[W]hen an amendment would destroy diversity the court should scrutinize that amendment more closely than an ordinary amendment." *Tujague v. Atmos Energy Corp.*, No. 05-2733, 2008 WL 489556, at *1 (E.D. La. Feb. 20, 2008).  If a district court permits joinder of a nondiverse defendant, and diversity was the sole basis for the court's subject-matter jurisdiction, it must remand the case to the state court. *See Cobb v. Delta Exports, Inc.*, 186 F.3d 675, 677 (5th Cir. 1999) (citing 28 U.S.C. § 1447(e)); *Lindsay v. Ford Motor Co.*, No. 94-10503, 1994 WL 684970, at *4–5 (5th Cir. Nov. 22, 1994) (citing 28 U.S.C. § 1447(e)).  Because of this, "a party may not employ Rule 15(a) to interpose an amendment that would deprive the district court of jurisdiction over a removed action." *Whitworth v. TNT Bestway Transp. Inc.*, 914 F. Supp. 1434, 1435 (E.D. Tex. 1996) (quoting 6 WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE: CIVIL, § 1447 at 562 (2d ed. 1990)).  A motion for leave to amend to add a nondiverse party whose inclusion would destroy

7

diversity and divest the court of jurisdiction is governed by 28 U.S.C. § 1447(e), not Rule 15(a). *See Tillman v. CSX Transp., Inc.*, 929 F.2d 1023, 1029 (5th Cir. 1991) (stating that a district court has discretion under § 1447(e) to decide whether to allow joinder of a nondiverse party who would destroy jurisdiction); *Whitworth*, 914 F. Supp. at 1435 (finding that 28 U.S.C. § 1447(e) trumps Rule 15); *Borne v. Siemens Energy & Automation, Inc.*, No. 94-3229, 1995 WL 15354, at *1 (E.D. La. Jan. 17, 1995) (same); *Lehigh Mech., Inc. v. Bell Atlantic Tricon Leasing Corp.*, No. CIV. A. 93-673, 1993 WL 298439, at *3 (E.D. Pa. Aug. 2, 1993) (same).

Under 28 U.S.C. § 1447(e), "[i]f after removal the plaintiff seeks to join additional defendants whose joinder would destroy subject matter jurisdiction, the court may deny joinder, or permit joinder and remand the action to the State court." In determining whether to allow joinder of a party under section 1447(e), a district court examines the factors set out in *Hensgens v. Deere & Co.*, 833 F.2d 1179 (5th Cir. 1987), and does not apply the "freely given" standard of Rule 15(a). *See Tillman*, 929 F.2d at 1029 & n.11; *Tujague*, 2008 WL 489556, at *1–2; *Dumas v. Walgreens Co.*, No. 3:05-CV-2290-D, 2007 WL 465219, at *1 (N.D. Tex. Feb. 13, 2007). In balancing the original defendants' interest in maintaining a federal forum against the plaintiff's interest in avoiding multiple and parallel litigation, a court considers: (1) the extent to which the purpose of the amendment is to defeat federal jurisdiction; (2) whether plaintiff has been dilatory in asking for amendment; (3) whether plaintiff will be significantly injured if amendment is not allowed; and (4) any other factors bearing on the equities. *Hensgens*, 833 F.2d at 1182. "[T]he balancing of these competing

8

interests is not served by a rigid distinction of whether the proposed added party is an indispensable or permissive party." *Hensgens*, 833 F.2d at 1182; *see also Mayes v. Rappaport*, 198 F.3d 457, 462 (4th Cir. 1999) (stating that joinder of nondiverse parties is committed to the sound discretion of the district court under § 1447(e) and "thus this decision is not controlled by a Rule 19 analysis").

Granting Arthur's motion for leave to amend to join additional party defendants would destroy diversity and this court's subject-matter jurisdiction. The analysis requires an application of the standard set out in *Hensgens v. Deere & Co,* 833 F.2d at 1182.

**B.     Analysis**

Applying the first *Hensgens* factor reveals that Arthur seeks to join nondiverse parties at least in part for the purpose of defeating diversity. Courts have observed that the *absence* of an earlier effort to remand a removed case is some evidence that a motion to add parties, including nondiverse parties, may not be for the purpose of defeating diversity. *See Tujague*, 2008 WL 489556, at *4 (finding that plaintiff's principal motivation was not to defeat federal jurisdiction but to assert a valid claim he did not know about when he filed suit because the plaintiff had made no prior attempt to have the suit remanded to state court and there was no indication that the nondiverse defendant was fraudulently joined). Conversely, Arthur's efforts to avoid a federal forum by filing in state court and naming a nondiverse party against which there was no reasonable possibility of recovery, then moving to remand when the case was removed, provide some evidence that she filed the motion to add new parties who would destroy federal jurisdiction for that purpose.

9

Under the first *Hensgens* factor, courts also look to whether the plaintiff timely stated a cognizable claim against the proposed new defendants. *Jackson v. Wal-Mart Stores, Inc.*, No. Civ. A. 03-2184, 2003 WL 22533619, at *2 (E.D. La. Nov. 6, 2003) (citations omitted); *see also Tillman*, 929 F.2d at 1029 (stating that the validity of the new cause of action is one indicator of whether the principal purpose of the proposed joinder is to defeat diversity); *Jade Marine, Inc. v. Detroit Diesel Corp.*, No. Civ.A. 02-2907, 2002 WL 31886726, at *3 (E.D. La. Dec. 20, 2002) ("[T]he aforementioned considerations – that plaintiff was not dilatory, that plaintiff's claim against Marquette is recognized under Louisiana law, and that denial of amendment may prejudice plaintiff – outweigh the Court's suspicion that at least part of the reason why plaintiff wants to sue Marquette is to defeat federal jurisdiction."). Arthur appears to state a cognizable claim against the proposed additional defendants. *See Chevalier v. Animal Rehabilitation Center, Inc.*, 839 F. Supp. 1224, 1232 (N.D. Tex. 1993) (citations omitted) (discussing claims for defamation and conspiracy to defame under Texas law); *Patillo v. Tarin*, No. 08-01-00091-CV, 2002 WL 1988172, at *4 (Tex. App.–El Paso Aug. 29, 2002, pet. denied) (same); *Barbouti v. Hearst Corp.*, 927 S.W.2d 37, 52–53 (Tex. App.–Houston [1 Dist.] 1996, writ denied) (same).

Although the proposed added claim appears cognizable, Arthur's evident intent to pursue her claims in state court supports a finding that she seeks leave to amend to add nondiverse parties in order to destroy federal diversity jurisdiction. The first *Hensgens* factor weighs against allowing leave to amend.

The second *Hensgens* factor analyzes whether the plaintiff was dilatory in seeking leave to amend.  It does not appear that Arthur was dilatory in filing her motion for leave to amend to add the additional party defendants, despite the facts that many of the emails and website postings cited in support of her motion were sent or posted in April and May 2007 and Arthur did not file her original complaint until October 9, 2007 and her motion for leave to amend until March 14, 2008.  Arthur explains the delay: "not being into the blogosphere, [she] was not aware of the perfidy of the new blogging defendants or of their connection to the current Defendants, nor should she have been aware."  (Docket Entry No. 62 at 5).  Arthur states that she did not know about the emails until "Havanna," a former member of the alleged "blogger" conspiracy, provided copies in January 2008, after Howard Stern denied in his January 4, 2008 deposition that he had given directions through his sister Bonnie to have "Havana" post defamatory messages on the web.  (*Id.* at 5–6).  Another blogger, "QV," provided Arthur copies of other emails and chatroom materials around the same time.  (*Id.* at 6).  Arthur states that she filed her motion for leave to amend four days after "Havana" agreed to "verify" the emails.  (*Id.*).

Courts generally find that a plaintiff is not dilatory in seeking to amend a complaint "when no trial or pre-trial dates were scheduled and no significant activity beyond the pleading stage has occurred."  *Herzog v. Johns Manville Products Corp.*, No. Civ. A. 02-1110, 2002 WL 31556352, at *2 (E.D. La. Nov. 15, 2002) (citations omitted); *see also Jones v. Rent-A-Center East, Inc.*, 356 F. Supp. 2d 1273, 1276 (M.D. Ala. 2005) (finding that plaintiffs were not dilatory because motion to amend was filed well within the time allowed

by the scheduling order).  In this case, no scheduling order has been entered and there has

been only minimal activity beyond the pleading stage.

Arthur asserts that she filed her motion for leave to amend within a few months after

learning the information on which she bases the allegations against the proposed new

defendants.  She filed the motion within several days after she "verified" the information.

This evidence weighs against a finding of dilatoriness. *Cf. Tujague*, 2008 WL 489556, at *4

(finding undue delay because "the information plaintiff needed to assert a direct claim against

[the nondiverse defendant] was in plaintiff's possession long ago").  The second *Hensgens*

factor weighs in favor of allowing amendment.

The third *Hensgens* factor looks to whether denying amendment would cause

prejudice.  After Arthur withdrew her motion to remand, she filed suit in Texas state court

against the same individuals and entities she seeks to add as new defendants in this case and

two other individuals, Lyndal Harrington and Theresa Stephens, alleging defamation and

conspiracy to defame.  (Docket Entry No. 74, Ex. A).  Arthur asserts that she does not wish

to pursue these parties in state court because of the expense and inconvenience of litigating

in both state and federal court and because of the risk of inconsistent results.  She argues that

she filed the state court suit to avoid limitations and preserve her claims in the event that this

court denies her motion for leave to amend.  (Docket Entry No. 75).

If Arthur is not allowed to amend this complaint to add the proposed additional

defendants, the claims against CBS and Howard Stern relating to the *Entertainment Tonight*

interview will proceed in this court, while the claims against  Stern and the new defendants

arising out of the internet postings will proceed in the state court.  Having to litigate these separate claims in separate proceedings, one state and one federal, is not a significant injury under *Hensgens*.  *See Apollo Alternative Fuels Co., LLC v. Energy Ventures Organization*, No. 3:06-CV-1278-L, 2007 WL 1002243, at *2 (N.D. Tex. March 31, 2007) ("While there will be additional costs associated with a parallel state action . . . Plaintiffs have wholly failed to state how they will be legally prejudiced.").  The individuals and the entities that Arthur seeks to add as new defendants are not indispensable parties under Rule 19 of the Federal Rules of Civil Procedure; Arthur does not need these individuals and entities to pursue her case against the existing defendants.  *See Holstine v. DaimlerChrysler Corp.*, No. L-06-53, 2007 WL 4611914, at *3 (S.D. Tex. Dec. 12, 2007) (refusing to allow joinder of dispensable parties).  Most important, the defamation and conspiracy claims Arthur alleges against the proposed new defendants are based on different facts and events than those she alleged as the basis of the claims in the present complaint.

The claims in the present complaint arise from the broadcast of the *Entertainment Tonight* interview with Marshall.  The claims against the proposed additional defendants arise from statements made in internet postings months later.  Although Arthur alleges that Howard Stern was involved in both the Marshall interview that was broadcast and in encouraging the later internet postings, the two lawsuits arise out of different events that occurred at different times and involved different people.  Because the claims are based on different facts and events, the lawsuits will not significantly overlap and there is little risk of inconsistent results.  Arthur will not be prejudiced by having to litigate these two sets of

13

claims in two different forums.  *See Tujague,* 2008 WL 489556, at *4 (finding a significant

risk of substantial injury if the plaintiff was not permitted to add a nondiverse defendant in

part because the existing claim and the claim against the nondiverse party arose "from the

same set of facts and circumstances"); *Riddley v. Walgreen Co.*, No. 3:07CV687TSL-JCS,

2008 WL 352549, at *4 (S.D. Miss. Feb. 7, 2008) (finding a risk of significant injury if

amendment were not allowed because plaintiff would be required to litigate separate actions

in two forums seeking the same relief from the same factual scenario); *Holstine*, 2007 WL

4611914, at *3 (finding no risk of significant harm in part because there was little risk of

relitigation if the plaintiff was forced litigate in both state and federal court due to a lack of

overlapping legal and factual issues).  The third *Hensgens* factor weighs strongly against

granting leave to amend to add the additional defendants.

 The final *Hensgens* factor requires this court to consider "any other factors bearing

on the equities."  Even under the more lenient "freely given" standard of Rule 15, courts have

held that leave to amend to assert a claim already at issue in a lawsuit in another court should

not be granted if the same parties are involved, the same substantive claim is raised, and the

same relief is sought.  *See Forbes & Wallace, Inc. v. Chase Manhattan Bank*, 79 F.R.D. 563,

565–67 (S.D.N.Y. 1978) (citing *Hanover Insurance Co. v. Emmaus Municipal Authority*, 38

F.R.D. 470, 472–73 (E.D. Pa. 1965) (denying motion to amend complaint to add a claim that

had already been decided in part in another federal action, the remainder of which had

already been raised in a pending state action); *United States v. Am. Optical Co.*, 7 F.R.D.

158, 159 (S.D.N.Y. 1945) (denying motion to amend answer to add cross-claim against

14

co-defendant identical to a claim already being litigated between these parties in another federal court)); *see also Buckley Towers Condominium, Inc. v. Buchwald*, 533 F.2d 934, 939 (5th Cir. 1976) (denying motion to amend complaint to add or join plaintiffs "in light of the commencement of a second action alleging substantially the same claims" filed in the same court); *Flintkote Co. v. Diener*, 185 F. Supp. 509, 510 (D.P.R. 1960) (denying motion to amend complaint under the Rule 15 "freely given" standard because the plaintiff had filed a separate action alleging the same claims in the same court).

Considering the *Hensgens* factors together leads to the conclusion that the original defendants' interest in maintaining a federal forum outweighs Arthur's interest in avoiding a separate state suit.  Arthur's motion for leave to amend to add additional party defendants is denied.

## III.    Stern's Motion to Dismiss for Lack of Personal Jurisdiction

### A.    The Legal Standards

"In a diversity action, a federal court may exercise personal jurisdiction over a defendant to the extent permitted by the applicable state law." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 867 (5th Cir. 2001) (citations omitted).  The Texas long-arm statute, TEX. CIV. PRAC. & REM. CODE ANN. § 17.041 *et seq.*, confers jurisdiction to the limit permitted by due process.  *See Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990) (citation omitted); *see also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413 n.7 (1984).  In Texas, the personal jurisdiction inquiry is the due process analysis.  *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 424–25 (5th Cir. 2005).

15

Due process limits the exercise of personal jurisdiction over nonresident defendants to cases in which defendants purposefully establish "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). A court must determine whether the defendant has the requisite minimum contacts with the forum state and whether the exercise of jurisdiction would offend traditional notions of fair play and substantial justice. *Polythane Sys., Inc. v. Marina Ventures Int'l, Ltd.*, 993 F.2d 1201, 1205 (5th Cir. 1993) (citations omitted).

A court may assert personal jurisdiction under a theory of either "general" or "specific" personal jurisdiction. A court exercises specific jurisdiction over a defendant if the cause of action alleged arises out of or is related to the defendant's contacts with the forum. *Helicopteros*, 466 U.S. at 414 n.8. When a court exercises personal jurisdiction over a defendant in a case *not* arising out of or related to the defendant's contacts with the forum state, the court is exercising general jurisdiction over the defendant. *Id.* at 414 n.9.

A court may exercise specific jurisdiction if: "(1) the defendant purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; and (2) the controversy arises out of or is related to the defendant[']s contacts with the forum state." *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 343 (5th Cir. 2004). The plaintiff must demonstrate a nexus between the nonresident defendant's

16

contacts with the forum and the cause of action. *Rittenhouse v. Mabry*, 832 F.2d 1380, 1390 (5th Cir. 1987).

When the cause of action does not arise from or relate to the foreign defendant's purposeful conduct within the forum state, due process requires that the foreign defendant have engaged in continuous and systematic contacts with the forum state before a court may exercise general personal jurisdiction. *See Helicopteros*, 466 U.S. at 414–15; *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 374 (5th Cir. 1987) (citation omitted). The plaintiff must demonstrate contacts of a more extensive quality and nature between the forum state and the defendant than those needed to support specific jurisdiction. *See Dalton v. R & W Marine, Inc.*, 897 F.2d 1359, 1362 (5th Cir. 1990) (citations omitted). "To exercise general jurisdiction, the court must determine whether 'the contacts are sufficiently systematic and continuous to support a reasonable exercise of jurisdiction.'" *Holt Oil & Gas v. Harvey*, 801 F.2d 773, 777 (5th Cir. 1986) (quoting *Stuart v. Spademan*, 772 F.2d 1185, 1191 (5th Cir. 1985) (citations omitted)). The continuous and systematic contacts test for general jurisdiction "is a difficult one to meet, requiring extensive contacts between a defendant and a forum." *Submersible Sys., Inc. v. Perforadora Central, S.A.*, 249 F.3d 413, 419 (5th Cir. 2001) (citation omitted); *see also Schlobohm*, 784 S.W.2d at 357 ("The minimum contacts inquiry is broader and more demanding when general jurisdiction is alleged, requiring a showing of substantial activities in the forum state.").

When a nonresident defendant challenges *in personam* jurisdiction, the plaintiff bears the burden of demonstrating facts supporting jurisdiction. *Stuart v. Spademan,* 772 F.2d

1185, 1192 (5th Cir. 1985) (citations omitted).  "The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery."  *Id.*  "When the district court rules on a motion to dismiss for lack of personal jurisdiction 'without an evidentiary hearing, the plaintiff may bear his burden by presenting a *prima facie* case that personal jurisdiction is proper.'"  *Quick Techs., Inc. v. Sage Group PLC*, 313 F.3d 338, 343 (5th Cir. 2002) (quoting *Wilson v. Belin*, 20 F.3d 644, 648 (5th Cir. 1994)).  The court "'must accept as true the uncontroverted allegations in the complaint and resolve in favor of the plaintiff any factual conflicts[.]'"  *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 869 (5th Cir. 2000) (quoting *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999)) (additional citations omitted).  However, the court is not obligated to credit conclusory allegations, even if uncontroverted.  *Panda Brandywine Corp.*, 253 F.3d at 869.

### B.    General Jurisdiction

Arthur argues that this court has general jurisdiction over Stern because of his physical presence in Texas in 2001 and 2002.[4]  During a five-month period in 2000 to 2001, Stern provided legal advice to Marshall in Texas in connection with probate proceedings involving the estate of her late husband.  During those five months, Stern gave statements to the press.

---

[4]Stern does not own any property in Texas, he does not have any bank accounts in Texas, he does not have an office or any employees, servants, or agents in Texas, he does not maintain a residence in Texas, and he has not entered into any contracts in Texas.  (Docket Entry No. 9, Ex. A).

Stern's Texas contacts during the five-month period in 2000 and 2001 are insufficient to establish general jurisdiction.  The fact that Stern was physically present in Texas for five months, during which he provided legal advice to Marshall and gave statements to the press, does not amount to engaging in continuous and systematic contacts with Texas.  *See Wilson v. Belin*, 20 F.3d 644, 650 (5th Cir. 1994) (finding no general jurisdiction over an attorney in Texas who carried his malpractice insurance through a Texas firm for less than a year but did no work for and received no compensation from that firm; performed approximately one legal project per year, each for a different firm, in Texas for three years before the suit; gave a legal seminar in Texas; and served as a pro bono consultant to a Dallas historical society for several years and, in this connection, made two trips to Dallas, wrote a letter to the editor that appeared in a Texas newspaper, wrote a book circulated, in part, in Texas, and gave a few interviews to Texas reporters over the years); *cf Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 447–448 (1952) (finding general jurisdiction over a Philippine corporation that temporarily relocated to Ohio because the corporation's president resided in Ohio, the records of the corporation were kept in Ohio, director's meetings were held in Ohio, accounts were held in Ohio banks, and all key business decisions were made there); *Holt Oil & Gas Corp.*, 801 F.2d at 779 (upholding general jurisdiction over a nonresident defendant who attended college in, owned real estate in, traveled to, and conducted extensive business dealings in the forum state to such an extent that his contacts evidenced "constant and extensive personal and business connections with [the forum state] throughout [the nonresident defendant's] adult life").

Arthur argues that in the future, Stern will have to use Texas probate courts to enforce his own claim to a six percent interest in the $88 million judgment Marshall obtained in a California court against her late husband's son in the litigation over the estate.  (Docket Entry No. 39 at 14–15).  Stern's possible future contacts with the State of Texas are not relevant to the general jurisdiction analysis.  *See Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 717 (5th Cir. 1999) (citing *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 569 (2d Cir. 1996)) ("General jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed.").

Stern's contacts with Texas were neither continuous nor substantial, as necessary for general jurisdiction.  The issue is specific personal jurisdiction.

### C.    Specific Jurisdiction

Arthur asserts that this court has specific jurisdiction over Stern because he allegedly conspired to have Marshall make defamatory statements during the *Entertainment Tonight* interview, which were made about, and directed toward, a Texas resident.  Arthur asserts that the primary injury from the statements occurred in Texas.  (Docket Entry No. 39).  Arthur also asserts that Stern's participation in the alleged conspiracy to defame her on the internet supports specific personal jurisdiction.  (Docket Entry Nos. 78, 83, 88).

Stern argues that this court does not have specific jurisdiction over him based on the *Entertainment Tonight* defamation claim.  Stern argues that the discussions and arrangements about the interview took place between the Bahamas (where he and Marshall were) and

California (where representatives of *Entertainment Tonight* were).  Stern asserts that although he was aware that *Entertainment Tonight* was broadcast nationally, he played no role in the decision to broadcast the interview in Texas and did not distribute copies of the interview in Texas.  (Docket Entry No. 9, Ex. A at 3).  Stern argues that because none of the alleged actions that form the basis of those claims occurred in Texas, the interview was broadcast nationally and was not specifically directed at Texas, and the interview primarily concerned events that occurred outside Texas, specific personal jurisdiction is unavailable. (Docket Entry No. 9).  Stern argues that the additional jurisdictional facts that Arthur asks this court to consider regarding the statements made on the internet are unrelated to the claims asserted against him in this case.  (Docket Entry No. 81 at 4–5).

In determining whether specific personal jurisdiction exists over Howard Stern, this court must assess his forum contacts independently from the contacts of the other alleged conspirators.  The question is whether Stern himself, not alleged coconspirators, had the requisite minimum contacts.[5]  *See Delta Brands Inc. v. Danieli Corp.*, 99 Fed. Appx. 1, 5 (5th

---

[5]Some courts have adopted what has been referred to as the "conspiracy theory of personal jurisdiction," under which a court may impute coconspirators' forum contacts to the defendant.  *See, e.g.*, *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1030–31 (D.C. Cir. 1997); *Textor v. Board of Regents*, 711 F.2d 1387, 1392–93 (7th Cir. 1983).  The more expansive version of the conspiracy theory of personal jurisdiction, in which one conspirator's contacts are attributed to another, has been sharply criticized as "short-circuiting" the due process analysis by "avoid[ing] consideration of the individual defendant's contact with the forum state – the very essence of jurisdiction."  *See* Ann Althouse, *The Use of Conspiracy Theory To Establish In Personam Jurisdiction: A Due Process Analysis*, 52 FORDHAM L. REV. 234, 253 (1983) (citations omitted) ("The legal principle that co-conspirators act as each other's agents when they act in furtherance of a conspiracy should not, by automatic operation of law, permit the attribution of one party's forum contacts to another.  Rather, the particular facts of the relationship between the parties must support the conclusion that the non-resident knew or should have known that by entering into the relationship he was exposing himself to the risk that he could be haled into court in the forum state . . . . Insofar as conspiracy theory becomes a device to bypass due process analysis, it is plainly unconstitutional.").

The Fifth Circuit has rejected the idea that one conspirator's contacts may be automatically attributed

Cir. 2004) (citing *Guidry v. United States Tobacco Co.*, 188 F.3d 619, 625 (5th Cir. 1999))

("To establish its prima facie case of specific personal jurisdiction [over a conspirator-

defendant], [the plaintiff] was required to demonstrate that [the conspirator-defendant]

individually, and not as part of the conspiracy, had minimum contacts with Texas.");

*National Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 773 (Tex. 1995) ("[W]e decline to

recognize the assertion of personal jurisdiction over a nonresident defendant based solely

upon the effects or consequences of an alleged conspiracy with a resident in the forum state.

Instead, we restrict our inquiry to whether [the nonresident defendant] itself purposefully

established minimum contacts such as would satisfy due process, and hold that it did not.").

The contacts relevant to specific personal jurisdiction in this case are those related to Stern's

involvement in the interview Marshall gave to *Entertainment Tonight* that contained the

allegedly defamatory statements about Arthur.

The leading authority on specific personal jurisdiction in a defamation case is *Calder

v. Jones*, 465 U.S. 783 (1984).  In *Calder*, a Florida editor and a Florida writer for the

*National Enquirer* were sued in California for libelous statements made in an article about

---

to another, stating that a plaintiff must "demonstrate that [the conspirator-defendant] individually, and not as part of the conspiracy, had minimum contacts with Texas."  *Delta Brands Inc. v. Danieli Corp.*, 99 Fed. Appx. 1, 5 (5th Cir. 2004) (citing *Guidry v. United States Tobacco Co.*, 188 F.3d 619, 625 (5th Cir. 1999)). Under this approach, a coconspirator's acts are relevant only to the extent that "the particular facts of the relationship between the parties . . . support[s] the conclusion that the non-resident knew or should have known that by entering into the relationship he was exposing himself to the risk that he could be haled into court in the forum state."  Althouse, *supra*, at  252 (footnotes omitted); *accord Nat'l Industrial Sand Ass'n v. Gibson*, 897 S.W.2d 769, 773 (Tex. 1995) ("[W]e decline to recognize the assertion of personal jurisdiction over a nonresident defendant based solely upon the effects or consequences of an alleged conspiracy with a resident in the forum state. Instead, we restrict our inquiry to whether [the plaintiff] itself purposefully established minimum contacts such as would satisfy due process.").

an actress.  The Supreme Court upheld the exercise of personal jurisdiction over the two

defendants because they had "expressly aimed" their conduct towards California:

> The allegedly libelous story concerned the California activities
> of a California resident.  It impugned the professionalism of an
> entertainer whose television career was centered in California.
> The article was drawn from California sources, and the brunt of
> the harm, in terms both of respondent's emotional distress and
> the injury to her professional reputation, was suffered in
> California.  In sum, California is the focal point both of the story
> and of the harm suffered.

*Id.* at 788–89.  In that case, the reporter and editor collaborating on the allegedly defamatory

article did so knowing the article was for their employer, the *National Enquirer,* which sold

more than 600,000 copies in the forum state every week.  *Id.* at 785.

A companion case decided on the same day as *Calder* shows that the important factor

was the extent of the defendant's activities, not merely the residence of the victim.  In *Keeton*

*v. Hustler Magazine, Inc.,* 465 U.S. 770 (1984), the victim of another allegedly defamatory

article sued not in the state where she lived, but in a different state with a longer statute of

limitations.  *Id.* at 772, 778.  Noting that the defendant had sold more than 10,000 copies of

its magazine every month in the forum state, the Supreme Court held that "it must reasonably

anticipate being haled into court there."  *Id.* at 781.

The limits of personal jurisdiction based on a tort "directed" to or affecting a forum

were explored in a recent Texas Supreme Court case.  *Michiana Easy Livin' Country, Inc.*

*v. Holten*, 168 S.W.3d 777 (Tex. 2005), involved an effort to assert personal jurisdiction over

a nonresident defendant based on the effects of a single telephone call made between that

23

defendant and a Texas resident.  The Texas Supreme Court emphasized several limits to the jurisdictional inquiry.  "First, it is only the defendant's contacts with the forum that count," not the "unilateral activity of another party or a third person."  *Id.* at 785 (internal quotations omitted).  "Second, the acts relied on must be 'purposeful' rather than fortuitous . . . a defendant will not be haled into a jurisdiction solely based on contacts that are 'random, isolated, or fortuitous.'"  *Id.* (citations omitted).

*Holten*'s jurisdictional issues arose from alleged business torts committed in the course of a single phone call placed by a Texas plaintiff.  The case involved the sale of a $64,000 motor home by the defendant, a factory outlet store that did business only in Indiana, to the plaintiff, a Texas resident.  The plaintiff initiated the transaction by placing a telephone call from Texas to the defendant in Indiana, sent his payment to Indiana, accepted delivery of the motor home from Indiana, and agreed to resolve any disputes in Indiana.  The sole basis for jurisdiction in Texas was a false statement allegedly made by the defendant in Indiana during the phone call.  *Id.* at 784.  The Texas Supreme Court was concerned that fortuitous circumstances, such as the fact that the person on the other end of the phone happened to be calling from Texas, could lead to finding the requisite minimum contacts.

Several of the problems the *Holten* court identified "if jurisdiction turns not on a defendant's contacts, but on where it 'directed a tort,'" are narrowly confined to the specific factual scenario before that court.  *Id.* at 790.  The *Holten* court observed that looking at where the effect of the alleged tort was directed, as opposed to the defendant's contacts with the forum relating to the subject matter of the litigation, would in the case before it conflate

the jurisdictional inquiry with the merits of the underlying action and would allow the nonresident to defeat personal jurisdiction only by proving that there was no tort. *Id*. at 790–91.

The facts of this case are far different from *Holten* and more similar to *Calder*. In this case, the jurisdictional contact was not a single telephone call but arranging and participating in an interview knowing that it would be nationally broadcast, including in Texas. The subject of the alleged defamatory statements lived in Texas. The statements were about events in Texas. As in *Calder*, and unlike *Holten,* whether a jury finds the statements at issue to be tortious is a separate inquiry from whether they were widely disseminated in the forum state and support specific personal jurisdiction.

This case, like *Calder*, alleges defamation. In the defamation context, "the sources relied upon and activities described in an allegedly defamatory publication should in some way connect with the forum if *Calder* is to be invoked." *Revell v. Lidov*, 317 F.3d 467, 474 (5th Cir. 2002). In *Revell v. Lidov*, 317 F.3d 467, an author posted an article containing allegedly defamatory statements about the plaintiff, a Texas resident, on a website. The article asserted that the plaintiff, an FBI official, was part of a politically motivated government conspiracy to permit the terrorist bombing of Pan Am Flight 103 over Lockerbie, Scotland. The plaintiff sued in Texas. The article mentioned the plaintiff by name, but the author was unaware that the plaintiff resided in Texas. The court found that the author was not subject to personal jurisdiction in Texas because the article contained no reference to Texas, did not refer to the Texas activities of the plaintiff, and was not directed at Texas

readers as distinguished from readers in other states.  *Id.* at 473.  The court acknowledged that the author "must have known that the harm of the article would hit home wherever [the plaintiff] resided," but noted "that is the case with virtually any defamation."  *Id.* at 476.  The court remarked that "[i]n short, this was not about Texas," and that "[i]f the article had a geographic focus it was Washington, D.C."  *Id.*

In *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, several German newspapers with small circulations in Texas published articles stating that the Swiss ambassador to Germany had engaged in an affair.  The ambassador and his wife, an American citizen from Texas, sued the newspapers for defamation in Texas.  The court held that the newspaper publishers did not have minimum contacts with Texas because the allegedly defamatory statements were not "directed at" Texas and the brunt of the harm to the plaintiffs did not occur there.  *Id.* at 426–28.  The clear focus of the articles was the affair, which occurred in Europe.  The information provided about the ambassador's wife's activities in Texas, including her time as a college student and model, "served merely to supply background, biographical information" and was "merely collateral to the focus of the articles."  *Id.* at 426–27.  Although some of the articles relied on Texas sources, including the wife's high-school yearbook and an interview with her ex-husband, these sources were only of "marginal importance" because they "led to no new substantial disclosures and supplied little more than the biographical backdrop for their story's protagonist."  *Id.* at 426.  The court found that the harm suffered by the plaintiffs was primarily centered in Europe, where the plaintiffs' careers were centered and the alleged injuries occurred.  *Id.* at 427.  With respect to one of the

publications, because it was reporting on the "German activities of German residents . . . in the German language, and 97% of the . . . issues were sold in Germany," the court found "[k]nowledge that sufficient harm would be suffered in Texas is conspicuously lacking." *Id.*

The authorities, including *Holten*, are consistent with exercising personal jurisdiction over Stern in this case.  The claim against Stern is not that he himself made the allegedly defamatory statements in the interview, but that he conspired to defame Arthur by arranging the *Entertainment Tonight* interview, urging Marshall to make the allegedly defamatory statements about Arthur, and republishing the interview.  The alleged conspiracy consisted of arranging a national broadcast of defamatory remarks about a Texas resident's activities that occurred in Texas.  The alleged defamatory remarks concerned Arthur's treatment of Marshall when she was a child in Texas.  Although Marshall resided in the Bahamas when she gave the interview from there, the statements at issue were about her experiences in Texas and were about an individual who then, and still, resided in Texas.  Stern knew that *Entertainment Tonight* was broadcast nationally, that Arthur had lived in Texas, and that the events discussed occurred in Texas.

The primary harm from the allegedly defamatory statements also occurred in Texas.  Unlike the plaintiffs in *Fielding*, Arthur lives in the forum state.  *See Fielding*, 415 F.3d at 427.  The fact that the interview was broadcast in other states does not diminish the fact that the statements about Arthur were directed at Texas and had foreseeable effects there.  *See Gordy v. Daily News*, L.P., 95 F.3d 829, 833–34 (9th Cir. 1996) ("Surely if some New York entity had written only 13 defamatory letters and sent them all to California, we would permit

a defamed California resident to sue the entity in California.  It is not clear why the distribution of 13 to 18 defamatory copies of a column loses magnitude as a contact simply because the Daily News does a lot of other things elsewhere.").  Unlike the article in *Revell*, the statements in this case referred to the Texas activities of the Texas plaintiff.  Stern acknowledged that he "knew [Arthur] probably had lived in Texas [at the time of the interview], but I didn't know for sure."  (Docket Entry No. 39, Ex. H at 116).  *See Revell*, 317 F.3d at 473.

Stern's work to arrange the interview was in the Bahamas, but that work was to arrange to broadcast statements to the nation, including Texas, about the Texas activities of a Texas resident.  Stern argues that the geographic focus of the interviews was on the Bahamas, not Texas, because the interview was primarily concerned with the death of Marshall's son and the birth of her daughter.  (Docket Entry No. 9 at 14; Docket Entry No. 22 at 6–7).  But it is undisputed that the interview included the statements about Arthur that are the subject of this case.  Unlike the newspaper articles in *Fielding*, the statements in this case about the Texas activities of the plaintiff were not made "merely to supply background, biographical information" and were not "merely collateral to the focus of" the overall publication."  *See Fielding*, 415 F.3d at 426–27.  The fact that multiple topics were discussed during the interview does not diminish the geographic focus of the statements about Arthur.

The additional jurisdictional facts about Stern that Arthur asks this court to consider relate to the alleged broader conspiracy involving the posting of defamatory statements on websites, not the alleged conspiracy between Stern and the media defendants to broadcast

28

defamatory remarks on *Entertainment Tonight*.  These additional jurisdictional facts are not relevant to whether this court has specific jurisdiction over Stern because specific jurisdiction arises when the defendant's contacts with the forum "arise from, or are directly related to, the cause of action," and this case relates solely to the alleged conspiracy between Stern and the media defendants to broadcast the defamatory statements made in the interview.  *See Revell*, 317 F.3d at 470.

The exercise of jurisdiction over Stern in this suit would not offend traditional notions of fair play and substantial justice.  "Factors that courts consider to make this determination include: (1) the burden on the defendant; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolutions of controversies; and (5) the shared interest of the several states in furthering fundamental social policies."  *General Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 Fed. Appx. 775, 793 (5th Cir. 2007) (citing *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990)).  Stern asserts that being forced to litigate this case in Texas would be unfairly burdensome because he is not a Texas resident, his attorneys are located in Georgia and are associated with a law firm that has only a small satellite office with a single attorney in Texas, and he has limited financial resources.  (Docket Entry No. 9 at 17).

Asserting personal jurisdiction over Stern is not unfair.  The alleged conspiracy consisted of arranging the national broadcast of defamatory remarks about a Texas resident's activities in Texas.  Texas has a strong interest in providing a forum for its citizens to file suit

for tortious acts that are directed at Texas and affect residents in Texas.  Arthur has a significant interest in pursuing this suit in Texas, where she is a current resident and has lived her entire life.  There is no reason why the controversy cannot be resolved as efficiently by a Texas court as by a court in some other state.  The fact that Stern has counsel in Georgia does not make litigating in Texas as opposed  to California or the Bahamas a significant additional financial burden, and any added burden is not the sort that courts have found to offend traditional notions of fair play and substantial justice.  *See, e.g., Gray v. Riso Kagaku Corp.*, No. 95-1741, 1996 WL 181488, at *4 (4th Cir. April 17, 1996) (finding that a South Carolina court's exercising jurisdiction over a Japanese corporation would offend traditional notions of fair play and substantial justice because of language and cultural barriers and the expense of traveling to South Carolina from Japan to defend the suit).

Stern argues that Texas is not the most convenient place for him to defend a suit and that defending a suit here imposes a greater financial burden than defending a suit in California or the Bahamas.  That burden does not make exercising personal jurisdiction over Stern improper.  *See Imagine Solutions, LLC v. Medical Software Computer Sys., Inc.*, No. 06 CV 3793(ARR)(JMA), 2007 WL 1888309, at *8 (E.D.N.Y. June 28, 2007) (finding that it did not violate due process for a New York court to exercise jurisdiction over Virginia defendants who claimed that litigating in New York would be burdensome because of limited financial means, work responsibilities, and a medical condition); *The Richards Group, Inc. v. Brock*, No. 3:06-CV-0799-D, 2007 WL 700896, at *5 (N.D. Tex. Mar. 7, 2007) (finding that the exercise of jurisdiction by a Texas court over a defendant whose residence and place

30

Case 4:07-cv-03742   Document 91   Filed in TXSD on 06/26/08   Page 31 of 31

of business were more than 600 miles from the court, and whose witnesses were mostly Tennessee residents, would not offend traditional notions of fair play and substantial justice); *Silicon Solar Housing Solutions, Inc. v. Farrell*, No. 4:06-CV-649-A, 2007 WL 162772, at \*5 (N.D. Tex. Jan. 22, 2007) ("While Farrell will suffer more of a financial burden by participating in litigation in Texas than he would if the action were pending in New York, such a burden would certainly be no greater on Farrell than would be the burden on Blake if he were to be required to litigate his claims against Farrell in a New York court.").

Stern's motion to dismiss for lack of personal jurisdiction is denied.

## IV.     Conclusion

Arthur's motion for leave to amend to add additional party defendants and Stern's motion to dismiss for lack of personal jurisdiction are denied.  KPRC Houston is dismissed.

SIGNED on June 26, 2008, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge